# WHEELING.

## PECK v MARLING'S ADM'R.

Submitted June 7, 1883—Decided November 24, 1883.

1. The legal disability of a married woman living separate and apart
   from her husband to enter into any contract is removed by sec-
   tion 13, chapter 66 of Code of W. Va., p. 449.   (p. 711.)

2. Such a married woman may be sued on any contract, which she
   may enter into, in a common law court, whether she had, when
   she made the contract, any separate estate or not.   (p. 714.)

3. A husband is not liable to be sued by the attorney for the wife in
   a suit to obtain a divorce *a vinculo matrimonii*, nor in a suit to
   obtain a divorce *a mensa et thoro* because of his abandonment
   or desertion of her ; but he is liable to such a suit, if the suit was
   for a divorce *a mensa et thoro* because of his actual cruelty or
   because of apprehension on her part of bodily hurt, and she suc-
   ceeded in the suit.   (p. 716.)

4. If a wife living separate and apart from her husband employs an
   attorney to bring a suit to obtain for her a divorce, which he
   does and succeeds in the suit, he may sue her in *assumpsit* on
   her implied promise to pay what his services are reasonably
   worth, whenever her husband could not under the third sylla-
   bus be sued by him for such services ; but he can bring no suit
   against her on such implied promise, where under the third
   syllabus he would have such action against her husband.   (p.
   720.)

5. But even where he would have had such an action against her
   husband, yet, if such married woman, when she employs such
   attorney to bring such a suit, expressly though verbally prom-
   ises him, that she will pay his fees, and he looks to her *alone*
   for the payment of his fees and every part of them, he may sue
   her on such express contract.  She is liable if by the express

contract he gave credit to her *alone;* but if to any extent he gave credit to her husband, he can not recover on such contract in a suit against her. (p. 721.)

6. The plea of *plene administravit* in an action against a personal representative on a debt of the testator or intestate tenders, as the statute-law now is in this State, an immaterial issue ; and the court ought not to permit it to be filed and, if filed, should strike it from the record. (p. 726–732.)

7. To a declaration in *assumpsit* on common counts the defendant pleads, that when the promises and undertakings named in the declarations were made, she was a married woman. To this the plaintiff may reply, that when such promises and undertakings were made, the defendant was living separate and apart from her husband ; and such replication is good. (p. 724–735.)

Green, Judge, furnishes the following statement of the case :

Daniel Peck at the July rules, 1879, in the county court of Ohio county filed his declaration in *assumpsit* against J. E. McKennan, administrator of Mary Marling, deceased. The declaration contained only the common counts, and with it was filed a bill of particulars as follows: "June 1, 1875, to services rendered in the case of said Mary Marling against Elijah Marling, her husband, for divorce from bed and board, commenced by filing the bill on the 23d day of October, 1872, the plaintiff succeeding and died about the first of September, 1875, three hundred dollars. Received seventy-five dollars by decree and paid out for costs and expenses twelve dollars and sixty cents, leaving to be credited sixty-two dollars and forty cents; balance due two hundred and thirty-seven dollars and sixty cents, add interest from the first day of June, 1875, sixteen dollars and forty cents, leaving total balance due two hundred and fifty-four dollars." This bill of particulars was on August 2, 1876, sworn to by the plaintiff as just. The declaration was demurred to, but it was in the usual form and good. The plea of *non-assumpsit* was filed and issue was joined upon it. There was also filed a plea of the coverture of the defendant's intestate, Mary Marling, when the promises and understandings in the declaration mentioned were made, and that till the time of her death she continued to be the wife of Elijah Marling, and also a plea of no assets to be administered, to the first of

which pleas the plaintiff replied, that the causes of action named accrued to him as counsel of said Mary Marling in her lifetime in prosecuting a suit in the circuit court of Ohio county in chancery by said Mary Marling against Elijah Marling, her husband, for a divorce from him; and that, at the time said services were rendered, she, the said Mary Marling, was living separate and apart from her husband, and by the decree of said court she obtained a divorce from her said husband. To this replication the defendant demurred, and issue was joined upon the demurrer. To the last special plea the plaintiff replied by traversing the same; and issue was joined thereon. The demurrer to the replication to the first of these special pleas was sustained; and the demurrer to the replication to the last of these special pleas was overruled. The case was then properly removed to the circuit court of Ohio county; and on June 6, 1881, it entered the following judgment:

"This cause came on to be heard upon the pleadings in the case and on the motion of the plaintiff that the court proceed to render final judgment herein, to which the defendant objects, the court being informed by the plaintiff that he had no other replication to make to the second plea of the defendant to the declaration of the plaintiff, it is here considered and adjudged by the court that the defendant go hence without day and recover his costs in this behalf expended against the plaintiff."

From the judgment of the county court of April 1, 1880, sustaining the demurrer to the first of these special replications and to the judgment of the circuit court the plaintiff obtained an appeal and *supersedeas* to this Court.

*Daniel Peck* for plaintiff in error.

*W. P. Hubbard* for defendant in error.

GREEN, JUDGE:

The principal question involved in this case is whether the county court erred in sustaining the demurrer to the replication of the plaintiff to the plea of the defendant, that his intestate was, at the time of making the contract sued on, a

married woman. The plaintiff in error claims that the replication alleged substantially, that she was then living separate and apart from her husband. Admitting for the present for argument's sake that this is the correct interpretation of this replication, ought the county court to have sustained the demurrer to it? It may be regarded as settled law in this State, that the plea of coverture, when the contract was made, is a good plea in bar to any action brought on any contract. (*Stockton* v. *Farley*, 10 W. Va. Rep. and also *Carey & Co.* v. *Burruss & Pitzer*, 20 W. Va. 571.) We are now to determine whether a replication to such a plea, that she was at the time the contract was made living separate and apart from her husband, is good. It is well settled in this State by the decisions, that a married woman living with her husband is in all cases utterly incapable of making any contract, which a court of law would regard as binding upon her. Such a contract is absolutely null and void as against her in a court of law.

The question now is: Would the fact, that, when the contract was made, she was living separate and apart from her husband, vary the case and render such contract valid against her in a court of law? At common law her contract would in a court of law be regarded as invalid and null as against her, when made while living separate and apart from her husband, precisely as it would be if she were living with him; and the only question to be considered is whether this legal incapacity to make any contract binding on her, which the common law imposed on every married woman, has been removed in this State by statute-law. If it has been so removed, it must have been by section 13 of chapter 66 of the Code of West Virginia, pages 449 and 450, which is as follows: "A married woman living separate and apart from her husband may in her own name carry on any trade or business; and the stock or property used in such trade, and the issues and profits thereof, together with her own earnings, realized from such trade or business, shall be her sole and separate property, and shall not be subject to the control of her husband nor liable for his debts."

Does this section remove the incapacity, which the common law imposed on a married woman living separate and

apart from her husband to make any contract binding on her? If it does, a common law court should recognize as valid against her a contract made by a married woman when living separate and apart from her husband, otherwise, it should not. This section does not expressly remove such incapacity from such married woman. Does it do so by implication? We ought not in interpreting a statute of this description to extend the fair meaning of the language of the statute, so as to include in it a removal of such incapacity of a married woman to contract, so universally recognized by the common law, when such purpose is not expressed in the statute, unless the implication of the removal of such incapacity is obviously necessary to carry out the clearly expressed objects of the statute. This we understand is the spirit, which pervades the West Virginia decisions above referred to.

It remains then to consider, whether the expressed objects of section 13 of chapter 66 of our Code would be practically defeated, unless we construed this section as impliedly removing the incapacity of a married woman living separate and apart from her husband to make contracts, which would be recognized by the common law courts as valid against her. This section expressly authorizes her in her own name, when living separate and apart from her husband, to carry on any trade or business. Can she practically do this, unless the common law courts recognize her contracts made in carrying on such trade or business as valid and binding on her? It seems to me obvious, that she can not. If, for instance, she was engaged in the very common business of buying and selling on credit goods, wares and merchandise or live-stock or provisions or meats, could she practically carry on such a business or many other kinds of business, if the common law courts refused to recognize her contracts as valid and binding on her? Who would deal with her if in every instance, where she did not comply with a contract of purchase, a chancery suit had to be brought to enforce against her separate estate any debt she might contract in her business? If engaged in business she could make contracts every day; and if these contracts were all deemed invalid in the common law courts against her, the practical effect would be to prevent any person from dealing with her in her business; and thus

she would be practically prevented from carrying on such trade or business, though expressly authorized to do so by this statute. We feel therefore compelled to construe this statute as impliedly removing from married women living separate and apart from their husbands the common law incapacity or disability of making contracts binding on them; and to hold that contracts made by such married women must be recognized as valid against them by the common law courts; and that if sued upon them in a common law court, they could not successfully rely upon their coverture, when the contracts were made as a bar to their liability on them.

These views are sustained by the spirit of the decisions generally in other States. Thus in *Frecking* v. *Rolland*, 53 N. Y. 422, 425, where the statute expressly authorized a married woman to carry on a trade or other business, the power to make contracts in relation to the business comes by implication from such statute. Andrews, judge, says in this cause: "The statute of March 2, 1860, provides that a married woman may carry on any trade or business and perform any labor or services on her sole and separate account, and the earnings thereof shall be her sole and separate property. The power of a married woman to make contracts relating to her separate business is incident to the power to conduct it. It cannot be supposed, that the Legislature, while conferring the power upon a married woman to enter into trade or business on her own account, intended that her common-law disability to bind herself by contract should continue as to contracts made in carrying on the business, in which she was permitted to engage. The power to engage in business would be a barren and useless one disconnected with the right to conduct it by the means usually employed." See also *Adams* v. *Honness*, 62 Barb. 336, in which this statute received the same construction.

In *Plumer* v. *Lord*, 5 Allen 460, under a precisely similar statute in Massachusetts it was held, that a married woman could under this statute enter into partnership in business with a third person, which would be recognized in a law-court as binding on her.

These were common law suits, in which these views were

expressed, and with other decisions construing statutes, which authorized married women generally to carry on business, confined her legal capacity to make a contract binding on her to be inferred from such statutes, to contracts made in carrying on such business. A difficulty would almost of necessity arise in determining what was meant by carrying on a business and when a contract was to be regarded as made by a married woman in carrying on a business. And on this question there have been various decisions. See *Holmes* v. *Holmes*, 40 Conn. 117, 120; *Chapman* v. *Briggs*, 11 Allen 546; *Proper* v. *Cobb*, 104 Mass. 589, 590.

It will be observed, that in these cases the statutes, which were being construed, authorized married women generally in their own names to carry on business, and of course were intended to be applied and in almost all cases would be applied to married women living with their husbands. And it seems, the courts reasonably construed such statutes as not removing the general incapacity of married women to enter into contracts, but confined it to contracts made by married women in carrying on their business. These statutes were thus confined in their operation to the few isolated cases, where married women engaged in business, but had the courts extended the meaning of these statutes and declared that they meant to remove from married women generally the disability of making legal contracts, the effect of such decisions would have been to extend to all married women the provisions of laws intended to be applied only to married women engaged in business. This it seems to me would have been an unwarrantable construction of these statutes; and the courts were forced to give to them this narrower construction, though it necessarily gave rise to controversies as to what was meant by "carrying on a business," and what was a contract made in carrying on a business.

Our statute however, as we have seen, is not applied to married women generally. They are not authorized to carry on a trade or business by the words of the statute; but only those married women who were living separate and apart from their husbands. And no doubt our statute was passed, because the Legislature saw that a married woman, abandoned by her husband or for any reason living separate and

apart from him, would necessarily be compelled to support herself, and would generally be necessitated, in order to do so, to engage in some trade or business, and therefore it was authorized. This necessity would as a general rule exist with the whole class, to whom it was applied, married women living separate and apart from their husbands. No mischief would therefore arise from giving a liberal construction to this statute to promote its general object to enable this class of married women to earn a living, and in carrying out this purpose to relieve them generally from the disability to make contracts, which the common law imposed on them. While doing this the court, would also avoid the embarrassing questions as to what was carrying on a business, and thus enable persons to deal with this class of married women without running the risk of a decision by the courts that a particular contract made with one of this class was not legally binding, because it was not made in carrying on a business. It seems to me therefore that this section 13 of chapter 66 of our Code being confined in its application to a small class of married women ought to be construed liberally in favor of this unfortunate class, and should be held to remove from them the common law incapacity to make contracts generally, and should not be confined to a removal of such disability, only when they were actually engaged in a trade or business, and should not be confined to contracts in carrying on such business.

It seems to me, that this class of married women having lost all the privileges and advantages, which the married state confers on women, was intended also by our statute-law to be relieved of the disabilities which the law imposed on married women. That this was the true spirit and object of section 13 of chapter 66 of our Code seems to me to be further shown by section 3 of this act p. 448, which provides, that while no married woman living with her husband can sell or convey real estate without the husband's consent, yet the unfortunate class of women not living with their husbands are by this third section authorized to convey their lands at their own pleasure in the same manner and with the same effect, as if they were unmarried. Taking the third and thirteenth sections together I think, that

the object of the Legislature was to remove from married women not living with their husbands all the disabilities imposed by the common law to making contracts of any description; and that this class of married women have the same capacity to enter into contracts of any sort, which will be recognized by the courts of common law, as have unmarried women.

The next enquiry is, if we admit that a married woman living separate and apart from her husband is bound generally by her contracts and that they may be sued upon in a court of law, will she be so bound by a simple contract to pay to a lawyer a fee in a suit, which she proposes to bring and does bring against her husband for a divorce either *a vinculo matrimonii* or *a mensa et thoro*, and in which she succeeds. This must depend upon whether or not this is a sufficient consideration, on which to base a promise to pay the lawyer's fee, for if it be not, her promise is a *nudum pactum*, by which she is not bound; for on such a promise she could not be bound, if she were a *feme sole*. It is true, that Lord Mansfield in the case of *Lee* v. *Muggeridge*, 5 Taun. 37, (1 Eng. C. L. 14) did use the following language: "It has been long established, that where a person is bound morally and conscientiously to pay a debt, though not legally bound, a subsequent promise to pay will give a right of action." But it may be now regarded as well settled, that this statement of the law is to some extent loose and inaccurate. We need not trace the course of decisions, from which it may be deduced, that this exposition of the law is wanting in accuracy. The correct exposition of the law is contained in the more recent case of *Eastwood* v. *Kenyon*, 11 Ad. & E. 438. It is that a moral as distinguished from a legal obligation, where there never was anything more than a moral obligation, is never a sufficient consideration to sustain an express promise. The cases cited in the note to *Wennall* v. *Adney*, 3 Bos. & P. (N.) 249, excludes the idea that a *mere* moral obligation can support an express promise. The consideration is deemed by them as sufficient where there was a precedent good consideration, or one from which the law would imply a promise, which might have been or could yet be enforced but for some positive rule of law, as for instance, a debt valid and subsist-

ing but discharged in bankruptcy, or barred by the statute of limitations, or the contract of an infant, which by a new promise may be confirmed at his majority.

As I conceive, according to the true principle when applied in its real spirit, whenever the promisee had a right either in law or *equity*, which has been lost or was unavailable only by some positive rule of law, this right, legal or equitable, which once existed or was prevented from having an existence only by some positive rule of law, would be a sufficient consideration to support a promise. In the case of *Littlefield* v. *Shee*, 2 B. & Ad. 811; (22 E. C. L. 187), the plaintiff, a butcher, supplied the defendant, a married woman, while her husband was abroad, with meat for her own use; and after his death she made an express promise to pay the butcher's bill. It was held, that this promise was a *nudum pactum*, as she was, when the meat was obtained, under no legal obligation to pay for it, her husband being the party bound to pay for the same, and therefore her promise after his death to pay for this meat was a promise based on a *mere* moral obligation, and therefore a *nudum pactum*. But I apprehend, that the case would have been otherwise decided, if, when she purchased the meat, she had been possessed of a separate estate, out of which she had then promised to pay the bill, and if by lapse of time this could not have been enforced in equity against her separate estate, and after her husband's death she had promised to pay it she could have been sued at law; for there would then have been a good consideration, a former equitable obligation, to support this promise.

Now a wife though living separate and apart from her husband, as when he has deserted her, has a legal right to necessaries on his credit; and a suit will lie against him for necessaries so furnished. (*Boeten* v. *Prentice*, 2 Stra. 1214; *Etherington* v. *Parrot*, 2 Ld. Raym. 1006 & 1 Salk. 118; *Harris* v. *Morris*, 4 Esp. 41; *Rawlyns* v. *Vandyke*, 3 Esp. 250; *Rotch* v. *Miles*, 2 Conn. 638.) What are deemed *necessaries* within this rule are defined in *Whittingham* v. *Hill*, Cro. Jac. 494. They are diet and apparel and, in the case of an infant, necessary learning; but the materials, whereby he is to maintain his trade, though he earns his living by his trade, are not regarded as necessaries; and therefore his contract for

such materials does not bind, nor is his covenant binding on him, whereby he binds himself as an apprentice. So too the wife could not borrow money on the husband's credit, so as to bind him, though she applied the money to buying necessaries. (*Earle* v. *Peale*, 1 Salk. 386; *Stephenson* v. *Hardy*, 3 Wills. 388.) She could however by her contract bind her husband, who had deserted her, for the rent of a house, in which she lived and kept boarders. (*Rotch* v. *Miles*, 2 Conn. 638.) Upon these principles it is further held, that, when a husband turns his wife out of doors, and she exhibits articles of peace against him or binds him over to keep the peace, her attorney may maintain a suit against him for his fees on her employment. On this subject Lord Ellenborough thus laid down the law:

"If she was turned out of doors, she carried along with her a credit for whatever her preservation and safety rerequired. She had a right to appeal to the law for protection, and she must have the means of appealing effectually. She might therefore charge her husband with the necessary expense of the proceeding, as much as for necessary food or raiment. (*Shepherd* v. *Mackoul*, 3 Campb. 326; *Turner* v. *Rookes*, 10 Ad. & E. 47; *Williams* v. *Fowler*, McClel. & Y. 269.)"

This principle has been extended still somewhat further, and it is held, it seems to me, properly, that where a wife has employed an attorney to obtain a divorce from her husband for actual cruelty, and there is reasonable apprehension of violence, when the suit is brought, or this apprehension of violence is established by her success in such a divorce suit, she may charge her husband without of course his concurrence with her attorney's fees in such suit, and the attorney may sue the husband therefor as the fees are in such case regarded as necessaries to her effectual protection, just as her attorney's fees are, when her husband is bound over to keep the peace, regarded as necessaries. (*Brown* v. *Ahroyd*, 5 El. & B. 819; L. & Eq. R. vol. 36 p. 214; *Rice* v. *Shepherd*, 12 C. B. 332; Eq. C. L. & Eq. 104, 330.) But this is the full extent to which the wife can go in charging her husband as for necessaries against his consent. If she sues for a divorce *a vinculo matrimonii* because of his adultery, though she suc-

ceed in her suit, her attorney cannot sue him for his fees in such suit as necessaries furnished his wife. This obtaining a divorce from him because of his misconduct rendering it distasteful and offensive for her to live with him as his wife any longer is a very different thing from food, raiment, lodging or protection to her person from his cruelty. These are in contemplation of law necessaries; but the saving of her feelings from outrage is not in law regarded as one of the necessaries. Indeed it can hardly be well conceived how the dissolution of a marriage can be necessary for the protection of a woman *as a wife*. The authorities as well as reason sustain the position, that a lawyer can not sue a husband for his fees in obtaining a divorce *a vinculo matrimonii* for his wife because of his adultery. ( *Wing* v. *Hurlburt*, 15 Vt. 607; *Dorsey* v. *Goodenow*, Wright 120; *Shelton* v. *Pendleton*, 18 Conn. 417; *Coffin* v. *Dunham*, 8 Cush. 404; *McCullough* v. *Robinson*, 2 Ind. 630; *Williams* v. *Monroe*, 18 B. Mon. 514; *Johnson* v. *Williams*, 3 Greene, Iowa, 97.)

To apply these principles of the common law to cases in this State as affected by our statute-law in force when the cause of action in this case, if any, arose. The grounds on which a divorce *a vinculo matrimonii* could be granted to a wife were: 1. Adultery of the husband; 2. Natural or incurable impotency of body existing at the time of the marriage; 3. Sentence of the husband to confinement in the penitentiary; 4. Conviction of the husband without the knowledge of the wife and prior to the marriage, of an infamous offence; 5. Willful abandonment and desertion by the husband of the wife for three years; 6. Notorious licentiousness of the husband prior to the marriage and without the knowledge of the wife. (Code, chapter 64, section 5.) Now from what we have said it is obvious, that the obtaining of divorce by a wife from her husband for any of these reasons can not be regarded as necessary in the only sense in which this word is used, when a wife is authorized by law without her husband's consent or even against his protest to charge him with necessaries; and hence we conclude, that the attorney for the wife in obtaining a divorce *a vinculo matrimonii* in this State can never sue the husband for his fee on her employment.

A divorce *a mensa et thoro* might be obtained by a wife, 1. For cruel and inhuman treatment; 2. For reasonable apprehension of bodily hurt; 3. For abandonment and desertion. (Code, chapter 64, section 6.) It follows from what has been said, that if the wife obtain a divorce for the first or second of these causes, her attorney might sue the husband for his fees, except when the cruelty complained of was not actual cruelty but only the statutory cruelty named in the clause of section 6 of chapter 64 of the Code, that is, the falsely charging the wife with prostitution. But if the divorce was obtained by the wife for the third of these causes, he could not sue the husband for his fees.

It remains now to determine where in this State the attorney would have a right to sue the wife for his fees, when he was employed by her to obtain a divorce, when she was living separate and apart from her husband, as in this case I suppose she was, and where she succeeds in this suit. And first if the suit was for a divorce *a vinculo matrimonii.* As the husband is not liable to be sued in such a case, it is obvious, that as when living separate and apart from her husband in this State she can make any contract as a *feme sole*, she could contract to pay her attorney's fees, whether she had or had not a separate estate; and if she made no express contract, she would in such case be responsible on her implied contract, as the services would have been rendered at her request and for her benefit; and her attorney could not demand compensation in such a case of her husband. It has been decided, that if she made a promise to pay her attorney's fees in such a case, after the dissolution of the marriage she could be sued on such promise. ( *Wilson* v. *Burr*, 25 Wend. 386 and *Viser* v. *Bertrand,* 14 Ark. 267.) Here a like promise in such case would bind her, if made before the dissolution of the marriage, if, when she made it, she was living separate and apart from her husband; for, as we have seen, such a promise is in this State as binding on her in a court of law, as if made while she was a *feme sole*, as for instance, after the dissolution of the marriage.

The next enquiry is: Could she be sued by her attorney for his fee on a promise made by her while living separate and apart from her husband, and when he was employed by

her to obtain for her a divorce *a mensa et thoro*? If the basis
of the suit for a divorce was an abandonment or desertion
of her by her husband, clearly she would be as liable to
such suit, as she would be, if the divorce sought was one *a vin-
culo matrimonii*.   And it would lie equally whether she had
or had not a separate estate, and whether her contract was
expressed or implied.   But the case would be different, if
the basis of the divorce suit was either cruel or inhuman
treatment on her husband's part or a reasonable apprehen-
sion of bodily hurt on her part.   The question is then one
more difficult to solve.   Whether she has a separate estate
or not, and whether he has much or little or no property,
if the suit is of the character above described, and the con-
tract only implied from the fact that the services were ren-
dered by her attorney, she can never be sued by her attor-
ney for his fees.   In such case, we have seen, the husband ·
is responsible for them, and the law itself would imply that
he was under such circumstances looked to by the attorney
for the payment of his fees to some extent, and it is imma-
terial to what extent he was thus looked to by the attorney;
for the authorities have clearly settled, that if the credit of a
third party is at all relied on, no matter how little, the de-
fendant cannot be liable, unless her promise is in writing;
for her contract in such case is necessarily collateral.   (*An-
derson* v. *Hayman*, 1 H. Black 120;   *Cahill* v. *Bigelow*, 18
Pick. (Mass.) 369; *Elder* v. *Warfield*, 7 Harr. & J. (Md.) 391;
*Norris* v. *Graham*, 33 Md. 56; *Jack* v. *Morrison*, 48 Pa. St.
113; *Hanford* v. *Higgins*, 1 Bosw. (N. Y.) 441; *Allen* v.
*Scarff*, 1 Hilt. (N. Y.) 209; *Bresler* v. *Pendel*, 12 Mich. 224;
*Welch* v. *Marvin*, 36 Mich. 59.

Of course she would in such case be responsible, if she
had given a written guarantee, though her husband had still
been looked to in whole or in part for such fees.   The ser-
vices having been rendered at her instance and for her bene-
fit would be a sufficient consideration to support her written
guarantee that he would pay the fees.   But such a case can-
not be made on the trial of this suit, because the declaration
is on a direct promise and not on a guarantee of a debt of
another, and therefore such proof could not be received un-
der this declaration.   But though her husband might be re-

sponsible for her attorney's fees, if the divorce sought was one *a mensa et thoro* and based on his cruelty, still she might be bound, if when living separate and apart from her husband she employed the attorney to bring such suit and *expressly* by a verbal contract promised to pay his fees, so that she and she alone was looked to by the attorney for such fees. The above cases and many others establish, that, if the defendant enters into a mere verbal contract or for a sufficient consideration makes a verbal promise to pay for the work to be done or goods furnished, if he *alone* was credited, he may be sued on such contract or promise, because in such case it is not a promise to pay a debt of another or to answer for his default within the meaning of the statute of frauds. Chapter 98 of Code, page 535, paragraph 4. When there is such express verbal contract, the difficulty is to determine whether as a matter of fact the credit was wholly given to the defendant. If so, she is responsible on her express promise; but if not, she is not responsible, unless her promise is in writing. In the case before us she could not be responsible, even if her contract was in writing, if it was a contract to pay her husband's debt, because such contract could not be proven under the declaration in this case, which is not on a collateral contract but a direct one.

My conclusion therefore is, that under the declaration in this case, if Mary Marling was living separate and apart from her husband, when she employed the plaintiff to bring the suit to obtain a divorce from her husband, though no express contract be proven, the mere rendition of the services would entitle the plaintiff in this suit to recover of her whatever the services were reasonably worth, provided the suit was brought for a divorce *a vinculo matrimonii* or for a divorce *a mensa et thoro* based on abandonment or desertion by her husband. But the plaintiff cannot recover of the defendant in this suit on such implied contract, if the suit was for a divorce *a mensa et thoro* based on his actual cruelty or on apprehension of bodily hurt on her part. In such case the plaintiff must look to the husband alone for his fees in such suit. If while living separate and apart from her husband Mary Marling entered into an express contract, though verbal, to pay the plaintiff his fees in such divorce suit, she

would be responsible in this suit, whenever she would be responsible on such implied contract, and also when by the express contract she promised to be responsible alone for the fees, and the plaintiff credited her alone and did not look to her husband for the payment of the fees to any extent.

I have thus far failed to notice the provision of our statute-law on divorces. In my judgment chapter 64 of the Code does not modify the law as we have stated it above. The first section of this chapter provides, that "In granting a divorce from bed and board the court may decree, that the parties be perpetually separated and protected in their persons and property. Such decree shall operate upon property thereafter acquired, and upon the personal rights and legal capacities of the parties, as a divorce from the bond of matrimony, except that neither party shall marry again during the life of the other." This provision evidently restores to a married woman, who has obtained such a divorce, a legal capacity to make contracts which shall be binding on her. And if it had been passed for the first time by the same Legislature, which passed the thirteenth section of chapter 66 of our Code, it might perhaps render it doubtful, whether the construction we have given this section was correct, as it leaves the removal of the legal incapacity of a married woman living separate and apart from her husband to be implied, while this divorce-law removes the legal incapacity of a married woman in express terms. But this provision contained in this thirteenth section of chapter 66 of our Code in reference to married women living separate and apart from their husbands was not enacted till the passage of the Code of West Virginia of 1869; while the other provision in the divorce-law has been always the statute-law of this State, being found just as it is in the Code of Virginia of 1849 chapter 109 section 11 page 473. So that from the failure of our Legislature in 1869 to use as express language on this subject as was used in the Virginia Code of 1849 in reference to divorced women, but little can be argued with reference to the legislative intent. It will be observed too under our construction of this thirteenth section of chapter 66 of our Code, the position and rights of a married woman simply living separate and apart from her husband are in material

respects different from those of a married woman, who has been perpetually divorced *a mensa et thoro.*

The ninth section of the chapter on divorces page 442 of our Code provides, that the court may make any order, which may be proper to compel the man to pay any sum, that may be necessary to enable the woman to carry on the divorce-suit. It might be argued, that, as the husband could under this provision be ordered during the pendency of any divorce-suit to pay fees to the attorney of the wife, therefore he ought not in any case to be liable to a common law suit for such fees; but no such inference can be properly drawn. His common law liability in the cases, in which it exists, as we have explained, cannot be taken away in this indirect manner. Of course he would be entitled to a credit in such suit for the amount, which the chancery court had compelled him to pay, which might of course destroy his whole responsibility, if the chancery court had ordered him to pay the whole amount of the fees of the wife's attorney; but this is often not done; for the amount so ordered to be paid does not depend, as it does in a suit against him, on the value of the services only but also depends in the chancery court on the wife's ability herself to pay her attorney his fees. It has been accordingly held, that this making of a husband pay the fees of his wife's attorney in a divorce court does not take away the common law action against him. Thus in *Rice* v. *Shepherd,* 104 E. C. L. 332 (12 Scott N. S.), Welles, J., says: "As to the mode of making the husband pay in the divorce court, this is only one of the numerous methods of giving a remedy. The action at common law is not taken away."

It remains only to apply these principles of law to the case now before us. To the plea that "Mary Marling before and at the time of the making of the promises and undertakings in the declaration mentioned was, and till the time of her death continued to be, the wife of Elijah Marling, sr.," the plaintiff, as we have seen, could have replied, that "at the time of the making of the promises and undertakings in the declaration mentioned, she, the said Mary Marling, was living separate and apart from her husband, Elijah Marling, sr." And such replication would have been good. It is argued, that this is substantially the replication

which was made in this case. But it seems to me to be materially different, and that the replication made in this case is defective in this, that it fails to state that she was, when she made the contracts in the declaration named, living separate and apart from her husband, and instead thereof says, that all the time the plaintiff was performing services for her in prosecuting a certain suit for a divorce from her husband, she was living separate and apart from her husband. For anything which is said to the contrary in this replication, she may have made the promises and undertakings named in the declaration, while living with her husband, in which case this suit could not have been maintained.

Again this replication unnecessarily and improperly undertakes to set out the consideration, on which the promises and undertakings in the declaration mentioned were based; and what is still worse, so sets out this consideration as to render it uncertain, whether the consideration, on which these promises were based, was a valid consideration or not. This consideration is stated in so vague a manner as to make it questionable, whether the promises and undertakings named in the declaration were or were not *nudum pactum.* It states that the consideration was the prosecution by the plaintiff of a suit in the circuit court of Ohio by Mary Marling against her husband for a divorce from him, and that she was divorced from him. But whether this divorce was a divorce *a vinculo matrimonii* or *a mensa et thoro* does not appear, nor does it appear, if it were a divorce *a mensa et thoro*, whether the ground of it was the actual cruelty of her husband or apprehended bodily hurt to her, or whether it was abandonment or desertion on his part. Yet, as we have seen, the decision of the question of *nudum pactum* depends not only upon the nature of the contract, whether or not it was implied or express, but also upon the character of the divorce, whether *a vinculo matrimonii* or *a mensa et thoro*, and if *a mensa et thoro* upon the grounds upon which it was based.

All these questions and considerations were necessarily involved in the issue of *non assumpsit* which has never been tried. They were improperly introduced into this special replication. It was a defect in pleading to state anything about the consideration in this replication. The county

court therefore did not err in sustaining the demurrer to this replication; but it did err in simply overruling the demurrer to the replication to the third plea instead of deciding the plea itself to be bad. In considering this demurrer the court should have gone back to the first error committed, which was in this third plea. It was the old plea of no assets in the hands of the administrator to be administered. This was an immaterial plea, and the court ought not to have permitted it to be filed; and upon its demurrer to the replication to this plea it should have decided, that the plea itself was bad. The twentieth section of chapter 131 of the Code provides, that a judgment for a debt due from a decedent may be entered to be paid out of the personal estate of, in, or which shall come into the hands of the personal representative to be administered. If the judgment entered is *quando acciderent* it is evidently immaterial whether there are assets in the hands of the administrator to be administered or not. And if this judgment is the one to be entered the plea of *plene administravit* would be immaterial, unless it would on such a judgment be conclusive as *res adjudicata*, that there were when the judgment was rendered, no assets in the hands of the administrator to be administered; but it is not so conclusive, nor would the judgment, if in the form of a judgment to be paid out of the assets of the decedent, in the hands of the administrator, be conclusive, that, when such judgment was rendered, there were assets in his hands to be applied to the payment of the judgment. This is the usual form of a judgment against an administrator for the debt of the decedent, simply because it has no such effect now; and it is entirely immaterial in what form such judgment is entered, and therefore immaterial whether the verdict of the jury on this plea of *plene administravit* is for the plaintiff or defendant; for section 24 of chapter 85 of the Code provides that " no personal representative or surety of his shall be chargeable beyond the assets of the decedent, by reason of any omission or mistake of pleading, or false pleading of such representative; and in an action on his bond the defendant may plead any plea and offer any evidence, which would be admissible in an action against a personal representative suggesting a *devastavit*."

It thus could not be determined in this cause, whether the personal representative had or had not assets in his hands to be administered applicable to the debt sued on. This plea therefore of *plene administravit* in this action was immaterial and on this demurrer it should have been so pronounced and ordered to be stricken from the record. The judgment of the circuit court of June 6, 1881, is erroneous in this that the circuit court proceeded then to pronounce a final judgment, though the plea of *non assumpsit*, upon which issue had been joined, had never been tried. The case was therefore in no condition to justify the court in rendering a final judgment. Instead of rendering such final judgment the circuit court ought to have required the plaintiff, if he did not elect to dismiss his suit, to go to trial on the issue of *non-assumpsit* and ought to have declined to render any final judgment, till this issue was tried. The only judgment, which could be rendered on the sustaining of the demurrer to the replication to this second plea had been rendered properly by the county court, when it sustained this demurrer.

It is argued however, that as the plaintiff moved the court to enter up a final judgment in the case then, he can not complain that the court entered up this judgment, though the case was in no condition to justify the rendition of a final judgment. No authority is cited to sustain this position; and it is untenable. It does not follow, because a party has asked a court to finally decide a case, when the condition of the case with reference to the pleadings does not then authorize the court to render a decision, that he would be bound by it and could not reverse it in an appellate court. It is obvious, that the other party, had the judgment been erroneous to his prejudice, could have it reversed; and in fact, it being an entirely unauthorized act for the court to enter judgment in the case, any party prejudiced thereby can ask its reversal.

The case of the *Baltimore and Ohio Railroad Co.* v. *Faulkner*, 4 W. Va. 180, like the present case, was a suit brought by Faulkner to recover a fee for professional services rendered the defendant in the court below, the Baltimore and Ohio Railroad Company. The company pleaded the statute of limitations and *non assumpsit*. No issues were joined on

these pleas; but at the instance of the Baltimore and Ohio Railroad Company, the intervention of a jury being waived by the parties, the court proceeded to hear the evidence, and judgment was rendered for the full amount of the fee claimed by the plaintiff. The Baltimore and Ohio Railroad Company, the defendant, brought the case to this Court on a writ of error and *supersedeas;* and this Court reversed the case because the circuit court had no authority to render any judgment in the case, when it did so, as no issues had been made on the pleas filed. Mr. Faulkner in that case, as do the counsel for the defendant in error in this case, urged that the Baltimore and Ohio Railroad Company could not be heard to complain, as the court had assumed to decide the case at the instance and suggestion of the company; but this Court paid no attention to this suggestion evidently regarded as of no value. We cannot sustain a judgment prejudicial to the plaintiff in error, which the court had no authority to render, when it did, simply because the plaintiff wanted a judgment then rendered, that he might obtain a writ of error to it with a view of avoiding the trouble and expense of a trial of an issue already made up; saving himself cost and trouble by imposing labor on this Court improperly; requiring this Court possibly to try and determine this case twice. If we had any discretion in the matter, we might for this cause be disposed to impose on him the costs in this Court; but in cases decided on writs of error this Court has certainly in most cases no discretion as to costs. But we cannot for such a reason refuse to reverse a judgment of the circuit court against the plaintiff, which it had no authority to render, the case being in no condition to justify the rendition of any judgment by the circuit court.

This judgment must therefore be set aside, reversed and annulled; and the plaintiff in error must recover of the defendant in error his costs in this Court expended, to be levied of the assets of his intestate in his hands to be administered; and this cause must be remanded to the circuit court of Ohio county, with instructions to strike from the record the second plea filed by the defendant as immaterial, and to permit the plaintiff to file another replication to the defendant's plea, if he should desire so to do, and then to proceed

further with this case according to the principles laid down in this opinion, and further according to law.

THE OTHER JUDGES CONCURRED.

REVERSED.  REMANDED.

---

### ON RE-HEARING.

GREEN, JUDGE:

During the term, at which the preceding opinion was announced and a decree entered in accordance therewith, on the petition of the counsel for the defendant in error a re-hearing was granted by an order of this Court.  After a careful review of the case after re-arguments the conclusions we have reached are, that the law, which governs the rights of the parties on the actual facts as set out in the pleadings in a very imperfect manner, is that which has been announced in the preceding opinion.  But that there are errors in that opinion in reference to the validity in law of the replication to the second plea, and in the opinion expressed that the the court below did not err in sustaining the demurrer to this replication.  Upon a careful review of the case we are of opinion that the court did err in sustaining the demurrer to this replication; and as a consequence thereof the judgment rendered by the circuit court as well as the judgment rendered by this Court at a former term are erroneous.

Our conclusions now are, that in this State, as at the common law, there is as a general rule a total incapacity for a married woman to make a contract, which will be regarded by a court of law as binding upon her; but that by virtue of sections 12 and 15 of chapter 66 of the Code of West Virginia, page 449, this incapacity of a married woman to make a contract binding on her in a court of law is entirely removed, when she makes such contract, while living separate and apart from her husband; and that when living separate and apart from her husband, she has the same capacity to make a contract, which shall be binding on her in a court of law, as she would have, if she were a *feme sole;* and that if work

and labor is done for her at her request by a third person, a court of law will imply a promise by her to pay such third person a reasonable compensation for such services, just as it would, if she were a *feme sole;* and that on this implied promise she may be sued in a court of law. But if the work and labor, which has been done at her request, was work and labor, which her husband or any other person was bound in law to pay for, no implied promise can be raised that she will pay for such services, as no implied promise under such circumstances could be raised against a *feme sole* or any one else. But if this service was not simply done at her request but upon an express promise made by her to pay for such services, and such services were accordingly done on her *sole* credit, she would be liable to pay for such services on this express contract, as it would be sufficiently supported by the fact, that the services were rendered for her on this express promise made by her and on her *sole* credit. This would prevent such express promise from being a *nudum pactum.* But if her husband was in law liable to pay for the services, though rendered to her and at her request, unless rendered on her express promise to pay for them and on her sole credit, she could not be sued at law. For if he were liable, even an express promise made verbally to pay such debt on her part would be a *nudum pactum;* for though the services were rendered at her request, yet if not rendered on her *sole* credit, it would be but a verbal promise to pay her husband's debt and not binding on her. She would be regarded under such circumstances as acting as her husband's agent in the employment of such person. If the person so employed was a lawyer, and the service, which he was employed by her to perform, while she was living separate and apart from her husband, was to institute a suit for a divorce from her husband, and the suit was instituted, and the divorce was obtained, she may be sued by the attorney for his fees in such suit, whenever her husband would not be legally responsible therefor; and he would be legally responsible only, where the suit was for a divorce *a mensa et thoro* based on actual cruelty or because of apprehension on her part of bodily hurt, but in no other case; and therefore in such case she would not be liable to such suit, but she would be, if the suit brought for her

was for a divorce *a vinculo matrimonii* or a divorce *a mensa et thoro* because of his abandonment or desertion. The reasons for these conclusions are fully set out in the opinion in this case delivered at a former term. In these respects we see no reason to change our opinion on the re-argument of this case. The only authorities cited to show these views to be erroneous in the re-argument are the following New York cases: *Third National Bank* v. *Elizabeth Blake et al.*, 73 N. Y. 260; *Ackley* v. *Westervelt*, 86 N. Y. 448; *Wood* v. *Wood*, 83 N. Y. 575, and *Tiemeyer* v. *Turnquist*, 85 N. Y. 518. These cases. appear to me to throw no light whatever on any points in this case, with the single exception of the last; and that case, so far as it has any bearing at all, sustains the views I have expressed. On page 518 Finch, judge for the court says:

"The section of the act of 1860 relied on, has no reference to and makes no provision for the liability of the wife in a personal action. Its plain scope and purpose is to free her property from the control of her husband and the burden of his debts and make it her sole and separate estate. This is done with a single exception, and that is, as against debts contracted by her as agent of her husband for the support of herself and her children." (There is in the statute-law of West Virginia no such exception.) "But she is not made personally liable for such debt, for it is not hers, but the debt of the husband. It is not her contract but his. She acts as his agent and binds him, not herself. The sole effect of the provision is, not to make her personally liable for her husband's debt, for not a word of such given import is found in statute; but merely that the shield and protection thrown over her property against the debts of the husband shall be withdrawn, in a case where his debt has been contracted, his liability incurred, through her acting as his agent and for the purpose of providing for her own support and that of the children."

So in the case before us we say, that in any case, where the attorney's fees in such divorce suit are a debt of her husband, that is, where he is liable to pay them, she is not liable, though the attorney was employed by her. For in such case his employment by her would be regarded not as an employment by her individually but only as an agent of her hus-

band, and she would be regarded as his agent, though he expressly forbid her to act as such. For when necessaries are purchased by a wife, her husband is responsible for them, and she is regarded in purchasing them to act as his agent, and that too, though the husband had notified the person furnishing the necessaries, that his wife was not his agent, and not to furnish her with any necessaries on his account. The authorities, which we have cited in the opinion pronounced at a former term of this Court, we think, fully sustain the position, which we have herein laid down; and in that opinion the reasons for these conclusions are stated at considerable length. After reviewing them and examining all the authorities referred to in the re-argument of this case we find no occasion to change our views, so far as they have been above expressed.

It remains now to review our opinion, so far as we expressed our views, of the pleadings in this case and of the judgment of the Court rendered in this case. The counsel of the defendant in error on the re-argument insist, that this Court erred in its conclusion, that the plea of *plene administravit* tenders now an immaterial issue, and therefore such plea should not now be allowed to be filed in any case. They insist that the Act of the Legislature of Virginia, from which § 24 of ch. 85 of our Code was taken, was passed January 13, 1806 (Acts of 1806–7, ch. 21, and R. C. of Virginia of 1819, p. 384, § 37); and while it provides, that no personal representative shall be charged beyond the assets of the decedent by reason of any omission or mistake of pleading of such representative, and while before the passage of this act in an action against the personal representative for a *devastavit* a verdict and judgment based thereon against such personal representative on a plea of *plene administravit* was conclusive in a court of law against such personal representative, and the court therefore in such suit for a *devastavit*, if the debt had not been paid, would regard the *devastavit* as conclusively established by such verdict, and would not permit the representative to again contend or prove, that he had not assets in his hands to pay such debts, yet this act did not render this verdict and judgment thereon immaterial; for while it did prevent it from being conclusive against the personal representa-

tive, as it had been, yet it was not rendered immaterial, for after the passage of this act such verdict and judgment were still *prima facie* evidence, that there were assets in the hands of the personal representative wherewith to pay such debt. To support this proposition counsel refer to 2 Lomax on Executors 704; *Braxton* v. *Wood*, 4 Gratt. 32; 1 Rob. (old) Pr. 215 and 216; *Miller's Ex'r* v. *Rice*, 1 Rand. 443. It is also contended by counsel, that there is nothing in this statute to indicate, that a judgment in favor of the personal representative on the plea of *plene administravit* would not be conclusive, that he had, when such judgment was rendered, no assets wherewith to pay the debt. "It may," say counsel, "be desirable for the personal representative at the earliest possible moment to show that he has no assets, instead of running the risk of losing his evidence by the death of witnesses or otherwise, when after a delay there may be a suit against him and a former judgment may be put in evidence showing that *prima facie* he had assets."

The decisions referred to do sustain what the counsel contends they establish. And he is right in saying that after the passage of this act of 1807 the plea of *plene administravit* was not regarded as tendering an immaterial issue, and such plea was frequently filed. But as it was evident that a jury was a very unfit tribunal to settle the accounts of a personal representative, and the filing of such pleas as *plene administravit* compelled such settlement by a jury, and because of the strong probability of their finding a verdict on an issue on such plea, which verdict would be in point of fact found erroneous on a proper settlement of his accounts, and thus either he or the creditor of the estate be to some extent prejudiced, the Legislature very properly concluded, that the attempt to have such duty performed by a jury, while it wasted the time of the court, was even worse than useless; and therefore in the Code of Virginia of 1849, ch. 177, § 20, p. 674; Edition of 1860 p. 733; Code of West Virginia ch. 132, § 20, p. 628, it was provided that "a judgment against a personal representative for a debt due from a decedent may without taking an account of the transactions of such representative be entered to be paid out of the personal estate of such decedent in, or which shall come into, the hands of the

representative." The effect of this act was to abolish thereafter all such settlements of the accounts of a personal representative by a jury. And as such a judgment might be entered in every suit for a debt brought against a personal representative without any sort of regard to the pleas put in the case or the issues joined, the conclusion is that thereafter it would be improper for the court to permit a plea of *plene administravit* to be filed, as the issue upon it thereafter became immaterial, the finding of the jury on it not affecting the judgment, which the court would enter, as it might enter the judgment in the form prescribed by this statute, no matter what was the verdict of the jury. After this the cases referred to by the counsel, as well as the cases referred to by Robinson and Lomax in these text books, all of which were rendered before the passage of this act in the Code of 1849, became of no value for the purposes, for which they are now cited by counsel for the appellee.

The error of the counsel is in assuming, that these decisions were rendered, while this last act, section 20 of chapter 131 of Code of West Virginia page 628, was in force. He says, " While it was in force, all judges and text-writers have supposed, that this plea of *plene administravit* was still good and proper. 2 Lom. Ex. 704; *Braxton* v. *Wood,* 4 Gratt. 32." But Lomax said what he did and the case of *Braxton* v. *Wood,* 4 Gratt. 32, was decided prior to the Code of Virginia of 1849 and therefore before the passage of this act, which abolished the settlement of accounts of personal representatives before a jury, and permitted the court in all cases to enter up a judgment *quando acciderent* and in effect abolished the plea of *plene administravit.* The counsel, I presume, has been led into this error by the fact, that the revisors opposite this section 20 of chapter 177 referred to several acts of the Assembly previous and to 1 R. C. of 1819 p. 494 § 25 and p. 543 § 49. And, I presume, without examining these references he assumed, that this provision of the Code of 1849 and of our Code was taken from the revisal of 1819 or these acts of Assembly. But an examination of them will show, that it was a new provision.

We conclude therefore that there was no error in the conclusion we reached on the first argument of this case, that

the plea of *plene administravit* tenders an immaterial issue and ought not now to be permitted to be filed.

In this case the defendant demurred to the plaintiff's declaration and to each count thereof, in which demurrer the plaintiff joined. The declaration consisted of two common counts correctly drawn. The demurrer was merely formal or put in for the purposes of embarrassment. The court never formally acted upon it, as it should have done; and this omission should now be corrected by this Court. The second replication was, that defendant's intestate, Mary Marling, before and at the time of the making of said supposed promises and undertakings in said declaration mentioned was, and till the time of her death continued to be, the wife of one Elijah Marling sr. It was in proper form and was of course a good plea. To this plea the plaintiff replied, that "The several causes of action in his declaration mentioned accrued to him as the counsel and solicitor of said Mary Marling in her lifetime in prosecuting a suit in chancery in the circuit court of Ohio county by the said Mary Marling against the said Elijah Marling, her husband, for a divorce from him, her said husband; and that during all the time of said services she, the said Mary Marling, was living separate and apart from her said husband and the said suit was between her and her husband; and by the decree of said court she obtained a divorce from her said husband, and this the plaintiff is ready to verify." The defendant demurred to this replication, the plaintiff joined therein and the county court of Ohio county, in which this suit was then pending, sustained this demurrer, and this Court when the case was formerly argued before us approved this action of the county court of Ohio county.

According to what we have said the proper replication was that "said Mary Marling before and at the time of making the promises and undertakings in the said declaration mentioned was a married woman living separate and apart from her husband Elijah Marling, sr., and this the plaintiff is ready to verify, wherefore he prays judgment, &c." Was the replication actually filed substantially equivalent to this? If it was, the demurrer to it should have been overruled; otherwise, it was properly sustained. In the opinion expressed, when the case was first submitted to this Court, I

gave it as my opinion, that the replication actually filed was not the equivalent of this which should have been filed. And in this the other members of the court then concurred. I said: "They seem to me to be materially different and that the replication filed is defective in this, that it fails to state, that she was, when she made the promises in the declaration mentioned, living separate and apart from her husband, and instead thereof says that all the time the plaintiff was performing services for her in prosecuting a certain suit for a divorce from her husband, she was living separate and apart from her husband." I then say, "for any thing, which is said to the contrary in this replication, she may have made the promises and undertakings named in the declaration, while living with her husband, in which case this suit could not be maintained." Was I right in this conclusion? Upon careful examination and reflection I think I was not.

In considering this point it should be borne in mind, that there was no count in the declaration based on a special contract; no special count, nothing but common counts. All that the declaration in the first count stated was, that Mary Marling was, to-wit, on September 1, 1875, indebted to the plaintiff in the sum of three hundred dollars for work and labor, care and diligence performed and bestowed as the attorney of the said Mary Marling upon her retainer in and about prosecuting divers suits and business for her and for fees due and of right payable to the plaintiff in respect thereof, and being so indebted she the said Mary Marling in her lifetime to-wit, on September 1, 1875, undertook and promised the plaintiff to pay him the said sum of money, when she should be thereunto afterwards requested. The second count stated that she in her lifetime accounted with the plaintiff, and upon such accounting was found indebted to the plaintiff in the further sum of three hundred dollars, and being so indebted she afterwards, to-wit, on September 1, 1875, undertook and promised the plaintiff to pay to him this last sum of money when requested. Yet she in her lifetime and her administrator since her death, though often requested, have not as yet paid the said sum or any part thereof, to plaintiff's damage, three hundred dollars. The bill of particulars

filed with the declaration was: "June 1, 1875—To services rendered in case of *Mary Marling* v. *Elijah Marling*, her husband, three hundred dollars."

Now according to a legal construction of this declaration when were the promises named in the first count made? It seems to me clearly, when the services of the plaintiff named were performed. For unless there is some express contract to the contrary, the moment services are performed they may be sued upon for an implied promise to pay for them. Of course the declaration always states an express promise though based on an implied promise, and it would be fatally defective, if it did not; but if it states this promise in the form, in which it is stated in this first count, the law construes it as a promise to pay for the services made immediately on the performance of the work; for on just such a declaration a suit may be sustained, though it was brought immediately after the performance of the service. When therefore the replication says: "That the several causes of action in the declaration mentioned accrued to the plaintiff as the counsel and solicitor of Mary Marling in her lifetime in prosecuting a suit in the circuit court of Ohio county in chancery by Mary Marling against Elijah Marling, her husband, for a divorce from him, and all the time of said services she was living separate and apart from her said husband," does he not in effect say: "That when the promises in this first count in the declaration were made, she was living separate and apart from her husband." And could this promise named in the first count of this declaration have been made, while she was living with her husband? It seems to me, that it could not consistently with what is alleged in this replication; for, as we have seen, the legal meaning of the language used in this first count is, that the promise to pay was made by her *immediately* on the performance of the services named in it. And this suit on this first count of the declaration could have been maintained accordingly immediately on the performance of this service. Hence I infer that this first count in its legal construction says, that the promise and understanding to pay the three hundred dollars named in it were made immediately upon the performance of the services named in it; and the replication says, when these services were performed she was living

separate and apart from her husband. Does it not then necessarily follow, that when the promises named in the first count were made (which the declaration in its legal effect says was when the services were performed) she was living separate and apart from her husband according to the allegation of the replication?

It has been suggested, that the request or retainer may have been while Mary Marling was living with her husband, though the services were rendered as stated in the replication, when she was living separate and apart from him; and in that case there could be no recovery, because she had no authority or power to retain counsel or request him to perform services for her, while she was living with her husband, and that such a request would be not obligatory on her, and the services would then be regarded as performed without her request. There seems to me to be no force in this suggestion; for the time of the request will be implied to be the time of the services rendered, and a request itself would be implied if the act stated as the consideration cannot from its nature have been gratuitous kindness; and this implication, that it was done at her request or an express statement of a request in the declaration would be a continuing implication during the rendition of the service; and when the replication says, that during the rendition of the service she was living separate and apart from her husband, it says in effect, that when he was retained to perform this service, she was living separate and apart from her husband; for the law would imply, that the request stated in the declaration was a request at the time the services were rendered. Of course this legal implication, when it would arise, might be rebutted by proof, for instance, that she protested against the rendition of such services. In this case the replication states, that in said suit, in which said services were rendered, she obtained a divorce from her said husband; and thus she got according to the statement of the replication the benefit of the plaintiff's services, and the law would imply, that it was, when rendered by the plaintiff, rendered at her request, and therefore the request is in effect stated in the replication to have been made, when she was living separate and apart from her husband; for it stated that the services were ren-

dered at that time and that she got the benefit of such services.

I conclude, therefore, that so far as the promises and undertakings named in the first count of the declaration is concerned the replication does in effect state, that they were made while Mary Marling was living separate and apart from her husband.

The second count states, that Mary Marling accounted with the plaintiff and was found indebted to the plaintiff in the sum of three hundred dollars and thereupon undertook and promised to pay said three hundred dollars. The replication says this cause of action accrued to the plaintiff as her counsel in the prosecution of a suit for a divorce from her husband, in which she succeeded; and that all the time he was rendering these services she was living separate and apart from her husband. If by the causes of action mentioned was meant the promises and undertakings named in the declaration, then this is an allegation that they arose in the prosecution of this suit, and during its whole pendency she was living separate and apart from her husband, and this would be the equivalent of an allegation, that when the several promises and undertakings in the declaration mentioned were made, she was living separate and apart from her husband. But by " the several causes of action in the declaration mentioned" as stated in the replication may be meant the sources of her indebtedness to the plaintiff, which she settled and accounted with the plaintiff for, and on which she was found indebted to the plaintiff in the sum of three hundred dollars. But if we take this to be the meaning of this language of the replication, it will not alter the meaning of the entire replication substantially. For it is expressly said, that these causes of action, we will suppose meaning sources of indebtedness, arose in prosecuting for her this divorce suit. If so, there arose immediately a promise to pay this indebtedness, and this promise to pay being thus made, when said services were rendered, the replication in effect alleges that these promises were made, while she was living separate and apart from her husband, where it alleges, that she was so living during all the time said services were being rendered. I infer therefore, that this replication in effect

alleges, that all the promises in the declaration mentioned whether in the first or second count were made while said Mary Marling was living separate and apart from her husband. And therefore the demurrer to this replication ought to have been overruled.

In the opinion, which I announced at the former term of this Court, I reached a different conclusion. This arose from my not bearing in mind the character of the declaration. If there had been, for instance, a count in the declaration, which had alleged, that on a given day, say August 15, 1875, she had promised in writing to pay the plaintiff three hundred dollars for services rendered in this divorce-suit, in which she had succeeded in obtaining a divorce on the first of August, 1875, it is obvious, that this replication would not have been good; for an allegation, that she was living separate and apart from her husband while the services were being rendered, that is, pending this suit, would then not have been the equivalent of an allegation, that when this promise was made, she was living separate and apart from her husband. If on the other hand the special count had said, that pending the said suit she had promised in writing to pay him three hundred dollars for his services past and to come in this suit, and that it was ended, then of course the replication would even more obviously than in the case as it now is, have been the equivalent of an allegation, that when this promise was made she was living separate and apart from her husband. To determine then, whether this replication was or was not good, required a special examination of the declaration; and I think I reached a false conclusion formerly from not sufficiently considering the character of the declaration. In my former opinion in this case I said: "This replication unnecessarily and improperly undertakes to set out the consideration, on which the promises in the declaration mentioned were based; and what is still worse so sets out this consideration, as to render it uncertain whether they were valid or a *nudum pactum*." This is all true, but it does not vitiate the replications on a general demurrer. It institutes a departure on pleading and is surplusage. Our Code, ch. 125, § 27, p. 603, declares, that such blundering in pleading, "unless there be omitted something so essential to the action or defence, that

judgment according to the law and the very right of the case cannot be given," shall be disregarded by the court. As I now regard this replication, nothing, which is essential to the making of a perfect replication, has been omitted; all that has been done is to state it in an informal manner and to add thereto other matter, which also is stated so imperfectly as neither to aid nor detract from the plaintiff's right of action. Under this provision of our Code, which in effect abolishes special demurrers, I am now of opinion that the county court erred in sustaining the general demurrer to this replication, and as a consequence the circuit court, when the case was removed to that court, erred in entering up a judgment on this demurrer so improperly sustained. Of course I erred in sustaining this action of the county court.

I have now gone over and determined every point arising in this case and the judgment we should enter is, that the judgment of the county court of Ohio county of April 10, 1880, should be reversed in so far as it sustained the demurrer to the replication to the second plea, and in so far as it overruled the demurrer to the replication to the third plea; and that the judgment of the circuit court of Ohio county rendered on June 6, 1881, should be reversed, and the plaintiff in error should recover of the defendant in error his costs in this Court expended to be levied of the assets of his intestate in his hands, or which may come hereafter into his hands, to be administered; and this Court proceeding to render such a judgment as the circuit court below ought to have rendered, should overrule the demurrer to the replication to the second plea, and as to the demurrer to the replication to the third plea it should be stricken from the record as well as the replication to this third plea and also the third plea itself; and this cause should be remanded to the circuit court of Ohio county that an issue may be properly made up on the replication to the second plea; that this issue and the issue on the plea of *non assumpsit* may be tried according to the principles laid down in this and the former opinions of this Court in this cause, and further according to law, or for such other and further proceedings to be taken as may be proper.

I might here having fully disposed of this case properly

stop. But assuming, that the county court did not err in sustaining the demurrer to the replication to the second plea in my former opinion, for the reasons therein stated I considered then, that the circuit court nevertheless erred in the judgment that on June 6, 1881, it entered up based on this sustaining of the demurrer to the replication to the second plea. If the action of the county court were now regarded by me as correct, I would not now deem this action of the circuit court based on it as erroneous. This conclusion I now reach not for the reason then urged, that the plaintiff moved the court to render final judgment therein, which reason I considered and acted upon, but for another and better reason not then urged, but which in the re-argument has been presented, and that is, that after the sustaining of the demurrer to the replication of the plaintiff to the second plea, if this had been properly sustained, and after the plaintiff informed the court, as the record shows he did, that he had no other replication to make to this second plea, the plea stood as to the facts stated in it as confessed, that is, the plaintiff admitted, that when the promises he sued on were made, the defendant's intestate was a married woman, and as he stated he had no replication to file whereby he could show, that despite her being a married woman, when she made these promises, she was nevertheless bound by them. It necessarily follows from these admissions, that the court must ultimately have rendered a judgment for the defendant. This being the case it was useless first to try the plea of *non assumpsit.* This issue had by these admissions of record by the plaintiff become immaterial; and therefore there was no necessity to try it before entering final judgment. These views are sustained by *Huff* v. *Broyles,* 26 Gratt. 283, cited by the counsel for the appellees on the re-argument of this case.

The law with reference to costs in the Appellate Court is found now in section 11 chapter 146 of Acts of 1882, p. 469 and is: "That costs shall be recovered in such court by the party substantially prevailing." In a chancery suit it frequently happens, that though a decree is reversed, costs are rendered against the appellant, as the appellate court may plainly see, that the decree rendered by it is more to the prejudice of the appellant than the decree of the court below,

which is reversed. But it is difficult to see how a judgment for costs could properly be entered against a plaintiff in error in a common law suit, when the judgment of the court below is reversed and the case remanded to the circuit court for trial. It would seem that in any case, which occurs to my mind now, if the plaintiff in error gets a judgment, which he complains of, reversed and a new trial is to be had by a jury in the court below, such plaintiff in error must be regarded as the party substantially prevailing, as this Court cannot anticipate what may be the verdict of the jury when it is thereafter tried. But there are in this case, as I now view it, according to the opinion above expressed immaterial matters, about which I would have expressed no views, if I had not expressed views in my former opinion, which I regard in some respects as erroneous. Had I not done so, I would express no opinion now as to what judgment should have been entered by the circuit court, if the demurrer to the second replication had been sustained, as this would be a mere hypothetical case, as in my judgment such demurrer should have been overruled; nor would I express any opinion as to the costs in this Court on such hypothetical case. According to the views I now entertain of course the plaintiff in error is entitled to his costs in this Court, he being clearly the party substantially prevailing in this Court.

WOODS, J., concurred—JOHNSON, P., concurred in the conclusion—SNYDER, J., concurred in the opinion except that portion which holds, that the replication to the second plea was substantially correct and dissents also from the conclusion.

REVERSED. REMANDED.